Filed 7/22/26  P. v. Cedeno CA5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | F088424 |
| Plaintiff and Respondent, | (Super. Ct. No. F21904240) |
| v. | |
| DAVID CEDENO, | **OPINION** |
| Defendant and Appellant. | |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Jonathan B. Conklin, Judge.

Janice M. Lagerlof, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Amanda D. Cary and Lewis A. Martinez, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant David Cedeno was convicted of first degree murder and possession of a firearm by a felon.  The jury found the firearm and gang enhancement allegations true.  On appeal, he contends the court erred by:  (1) admitting gang evidence in the prosecution's case-in-chief; (2) allowing a law enforcement officer to identify defendant as the shooter based on a review of surveillance footage; and (3) declining to dismiss the firearm enhancement under Penal Code[1] section 1385.  Additionally, he requests we order modification of the trial court's sentencing minutes to reflect the court's intent to, at most, impose the minimum restitution fine ($300) under section 1202.4.  He also requests we order modification of the trial court's abstract of judgment to strike the imposition of two ancillary costs, specifically, an $80 court operations fee (§ 1465.8) and a $60 conviction fee (Gov. Code, § 70373).

While this appeal was pending, the California Supreme Court issued *People v. Kopp* (2025) 19 Cal.5th 1 (*Kopp*).  We ordered the parties to file supplemental briefing addressing:  whether the trial court's failure to impose or strike the ancillary costs resulted in an unauthorized sentence or otherwise constituted error; and what is the appropriate remedy?

We remand for the limited purpose of allowing the trial court to conduct a hearing on whether to impose the ancillary costs in light of *Kopp*.  We otherwise affirm the judgment.

## PROCEDURAL SUMMARY

On May 9, 2024, the District Attorney of Fresno County filed a first amended information charging defendant with the murder of Elizandro Diaz (§ 187, subd. (a); count 1) and possession of a firearm by a felon (§ 29800, subd. (a)(1); count 2).  As to count 1, it was alleged a principal personally and intentionally discharged a firearm causing great bodily injury or death (§ 12022.53, subds. (d), (e)(1)), and the offense was

[1] All further statutory references are to the Penal Code unless otherwise indicated.

2.

committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)). It was further alleged defendant had suffered a prior strike conviction (§§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d)).

On June 21, 2024, the jury convicted defendant of both counts. In doing so, it found the murder was committed in the first degree. In a bifurcated proceeding, the jury found the enhancements as to count 1 true. The trial court found true defendant's prior strike conviction allegation.

On July 25, 2024, the trial court sentenced defendant to 25 years to life for count 1, which was doubled to 50 years to life under the Three Strikes law. The court further sentenced defendant to a consecutive 25 years to life for the firearm enhancement. The gang enhancement was stayed under section 654, and the four-year prison sentence on count 2 was ordered to run concurrent to count 1. The court's sentencing minutes indicate that the court imposed a $10,000 fee each under sections 1202.4 and 1202.45, which it ordered suspended, as well as the imposition of a court operations fee (§ 1465.8) in the amount of $80, and a criminal conviction fee (Gov. Code, § 70373) in the amount of $60.

Defendant filed a timely notice of appeal on July 29, 2024.

## FACTUAL SUMMARY

*The Market*

On April 13, 2021, Diaz and two coworkers, M.M. and M.H., visited a market in Reedley during a meal break. Diaz went inside the market, and Rodrigo Godinez walked in soon after. Godinez was wearing a dark charcoal grey shirt. Godinez and Diaz started saying "some words" to each other. This "verbal interaction" (boldface omitted) was described as not friendly based on the way Godinez and Diaz were acting and referring to each other, as well as their movements and tone of voice. M.M. and M.H. tried to distract Diaz from the interaction, but "the words just kept going." Defendant, who was

3.

wearing a white shirt on that day, walked up to the market and looked through the window while the others were still inside.

*Diaz and M.M. Return to Their Workplace*

Several minutes after the verbal interaction, Diaz and M.M. left the market and got into M.M.'s car. Godinez left the store and got into the passenger seat of defendant's car. A person nearby observed the driver of this car, defendant, was "hyped up" and yelling in the parking lot but could not hear what he was saying. Defendant then followed M.M.'s car back to their place of work.

*Shooting*

M.M. parked on the street near their workplace. After defendant drove past M.M.'s car, Diaz got out of M.M.'s car and walked across the street holding a plate of food. Defendant made a "U-turn" (boldface omitted) and drove directly toward Diaz. Diaz threw his food at defendant's car. Someone from inside defendant's car fired multiple shots from a firearm, striking Diaz in the back and killing him. Defendant and Godinez were seen by someone else laughing in their car.

M.M. could not tell whether the passenger or the driver was the shooter, but she saw that the hand which fired the gun was "in the passenger seat." Another nearby worker, N.G., saw the "passenger," who was "chunky," with "spiky hair," and wearing "the white shirt and … a gold chain," pull "something" out. N.G. could not tell whether that person was in the driver's seat or the passenger seat, but she stated that his face looked "serious."[2] Reedley Police Detective C. Cardenas, the lead detective in the investigation, opined that the person in the car wearing the white shirt was the shooter. Cardenas also stated defendant was heavier set than Godinez.

---

[2] N.G. previously stated to law enforcement in an interview that she believed the passenger was the shooter.

4.

*Defendant's Arrest, Jail Call, and Jail Video*

On May 29, 2021, defendant was arrested in Lebanon, Missouri. Defendant had a gold chain in his possession, which was obtained by law enforcement. Defendant was about 50 to 75 pounds heavier at the time of his arrest than he was at the time of his trial. Defendant did not have face tattoos at the time of his arrest.

On September 24, 2022, in a jail call between defendant and an unknown male, defendant discussed with the unknown male how they used to go "[m]obbing." He stated, in part: "We aint [*sic*] got nothing better to do. Let's just mob and look for some scraps."

On October 22, 2023, defendant was seen in a jail video with tattoos on his face. About 10 minutes beforehand, defendant was seen in another jail video without the tattoos on his face.

*Bifurcated Gang Evidence*

Further evidence was presented to the jury in the bifurcated proceeding after they had reached their verdict on the substantive offenses. Investigator O. Torres, who was assigned to the Multi-Agency Gang Enforcement Consortium, testified to gang hand signs by both the Norteños and the Sureños. One hand sign by the Norteños was "SK," which stood for "[s]crap killer." Torres stated that a "[s]crap" is a derogatory term for a Sureño. Torres testified that Norteños often avoid using the letter "S" in a word by either crossing it out or replacing it with the letter "Z." He further testified the Varrio Eastside Reedley was a subset of the Norteños criminal street gang, and that the crimes committed by the subset benefited the Norteños criminal street gang as a whole.

Torres stated defendant and Godinez were members of the Varrio Eastside Reedley subset of the Norteños criminal street gang on April 13, 2021. Torres testified that defendant's face tattoo, of a letter "S" crossed out by two lines, was significant because it was a way Norteños disrespect Sureños and to identify themselves as well. He

further testified that defendant's other face tattoo, of a letter "E," combines to make "ES" which was a very common sign for Varrio Eastside Reedley.

Diaz had the letters "VLS" tattooed on his fingers. Torres testified these letters stood for Vatos Locos Sureños, which was a subset of the Sureños criminal street gang out of Orange Grove, California. Torres opined a Varrio Eastside Reedley gang member shooting a Sureños dropout in the back would benefit the Norteños criminal street gang since it would involve eliminating a member of a rival gang, and would instill fear and intimidation in the rival gang and the community.

## DISCUSSION

### I. Admission of Gang Evidence

Defendant contends the trial court prejudicially erred by admitting gang evidence during the trial of the substantive offenses. The People contend the court's admission of evidence was not erroneous, and any assumed error was harmless. We agree with the People on both contentions.

### A. Additional Background

Prior to trial, defendant filed several motions in limine concerning gang evidence. First, he moved to bifurcate the gang enhancement under section 1109. He also moved under Evidence Code section 352 to exclude "any and all evidence of [defendant's] gang participation" (boldface & capitalization omitted), and to exclude reference to the victim as a dropout gang member.

In its trial brief, the prosecutor moved to admit two jail video recordings to show defendant altered his appearance since the shooting by having tattoos engraved on his face. In doing so, the prosecutor sought to admit testimony of Torres to explain the gang significance of defendant's facial tattoos. The prosecutor also moved to admit a phone call made in jail, during which defendant mentioned previously " 'mobbing' " and looking for " 'scraps,' " as well as testimony from Torres explaining that these terms meant hunting for rival gang members, and specifically, Sureños. The prosecutor further

6.

moved to admit certain gang evidence during the first phase of the trial, including expert testimony on:  the Norteños and Sureños criminal street gangs; defendant's and Godinez's membership in the Norteños criminal street gang; Diaz's membership in the Sureños criminal street gang; the expectation by gang members within the Norteños criminal street gang to "act on sight" of a perceived and/or actual rival; and an explanation of the potential reluctance of witnesses to testify.

At a hearing, the prosecutor argued that limited gang evidence should be admitted in the first phase of trial to prove motive.  Defendant opposed, noting there was no evidence of gang-related words or derogatory terms uttered during the series of events. The prosecutor highlighted that Diaz had a blue lanyard displayed out of his pocket and had Sureños tattoos visible on his hand.

The court stated its belief that the applicable law did not exclude "otherwise relevant evidence."  The court indicated it would admit "very limited evidence from a qualified gang expert" that defendant "was a gang member of one gang and that Mr. Diaz was a member of an opposing gang, and that it is within gang culture that when those two gang members are in an area, that they confront each other."  In doing so, the court stated its concern with excluding the gang evidence was it would "essentially put[] the shooting itself in a sterile vacuum," since "it would not allow the People in any way to explain a potential motive, which is relevant."

Defense counsel highlighted the lack of evidence demonstrating the shooting was gang related, and argued introducing gang evidence would "make it gang motivated." The court noted it understood defense counsel's position, including the argument that admitting gang evidence would "essentially emasculate[]" the bifurcation requirement under the applicable law.  After considering both the probative value and prejudicial impact of the contested evidence, the court found the prejudicial impact did not substantially outweigh the probative value.

During the first phase of the trial, the parties stipulated that Norteños and Sureños were criminal street gangs, defendant and Godinez were active members of the Norteños, and Diaz was a dropout of the Sureños. Torres testified that Norteños was the dominant gang in Reedley. Norteños, who identify with the color red, were rivals with the Sureños, who identify with the color blue. Sureños dropouts also display the color blue. According to Torres, when a Norteño encounters a Sureño, the Norteño is supposed to "act on sight," meaning, to "immediately attack" and, if the opportunity presents itself, to kill that rival gang member. Norteños treat a Sureños dropout the same as "active" Sureños. Torres further testified that in a small town such as Reedley, it was very common for gang members to have grown up with people who later joined a rival gang, and so it was "not hard to know who is who in town and it benefit[ed] them to know who's who."

The trial court instructed the jury on how it may consider the gang evidence (CALCRIM No. 303 [limited purpose evidence in general]). The court stated:

> "For Count 1, you've heard evidence regarding gangs. This evidence may only be considered -- may only be used to consider a potential motive and for no other purpose."

### B. Applicable Law and Standard of Review

Only relevant evidence is admissible. (Evid. Code, § 350.) Evidence is relevant if it has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) The court may exclude relevant evidence "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)

8.

"Prior to the enactment of section 1109, trial courts were authorized, in their discretion, to bifurcate trials so that a gang enhancement allegation would be tried separately from a charged offense, when appropriate to avoid undue prejudice to the defense." (*People v. Burgos* (2024) 16 Cal.5th 1, 10.) In 2021, the Legislature passed Assembly Bill No. 333 (2021–2022 Reg. Sess.) (Assembly Bill No. 333), which became effective on January 1, 2022 (see Stats. 2021, ch. 699). (See *People v. Tran* (2022) 13 Cal.5th 1169, 1206.) As relevant here, Assembly Bill No. 333 " 'added section 1109, which requires, if requested by the defendant, a gang enhancement charge to be tried separately from all other counts that do not otherwise require gang evidence as an element of the crime.' " (*People v. Burgos*, at p. 9; see § 1109.) Section 1109 provides:

"(a) If requested by the defense, a case in which a gang enhancement is charged under subdivision (b) or (d) of Section 186.22 shall be tried in separate phases as follows:

"(1) The question of the defendant's guilt of the underlying offense shall be first determined.

"(2) If the defendant is found guilty of the underlying offense and there is an allegation of an enhancement under subdivision (b) or (d) of Section 186.22, there shall be further proceedings to the trier of fact on the question of the truth of the enhancement. Allegations that the underlying offense was committed for the benefit of, at the direction of, or in association with, a criminal street gang and that the underlying offense was committed with the specific intent to promote, further, or assist in criminal conduct by gang members shall be proved by direct or circumstantial evidence.

"(b) If a defendant is charged with a violation of subdivision (a) of Section 186.22, this count shall be tried separately from all other counts that do not otherwise require gang evidence as an element of the crime. This charge may be tried in the same proceeding with an allegation of an enhancement under subdivision (b) or (d) of Section 186.22."

"[S]ection 1109 does not disturb existing case law holding that gang evidence may be admitted to prove substantive crimes." (*People v. Garcia* (2024) 107 Cal.App.5th 1040, 1049 (*Garcia*).) " 'Evidence of the defendant's gang affiliation—including

evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime.' " (*People v. Chhoun* (2021) 11 Cal.5th 1, 31 (*Chhoun*).) "Even when it is relevant, however, 'courts should carefully scrutinize evidence of a defendant's gang membership because such evidence "creates a risk the jury will improperly infer the defendant has a criminal disposition and is therefore guilty of the offense charged." ' " (*Ibid*.)

We review the trial court's ruling for abuse of discretion. (*Chhoun*, *supra*, 11 Cal.5th at p. 31; *People v. Albarran* (2007) 149 Cal.App.4th 214, 224–225 ["[T]he decision on whether evidence, including gang evidence, is relevant, not unduly prejudicial and thus admissible, rests within the discretion of the trial court."].) " 'Where, as here, a discretionary power is statutorily vested in the trial court, its exercise of that discretion "must not be disturbed on appeal except on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice." ' " (*People v. Williams* (2013) 58 Cal.4th 197, 270–271.)

### C. Analysis

The trial court did not abuse its discretion when it admitted expert testimony evidence on Norteños and Sureños criminal street gangs, as well as the past or current membership of defendant, Godinez, and Diaz in those gangs. The evidence was relevant to prove motive. (See *People v. Tran*, *supra*, 13 Cal.5th at p. 1208 ["gang evidence, even if not admitted to prove a gang enhancement, may still be relevant and admissible to prove other facts related to a crime"]; see also *People v. Wallace* (2008) 44 Cal.4th 1032, 1058 [" ' "The test of relevance is whether the evidence tends ' "logically, naturally, and by reasonable inference" to establish material facts such as identity, intent, or motive.' " ' "].) As the court indicated, gang culture includes intimidating or injuring a

member of an opposing gang upon confrontation.  It is reasonable to infer that Diaz's affiliation with the Sureños may have served as an explanation for the shooting.  And, though the court recognized the potential prejudice from the evidence, the court correctly concluded the potential prejudice did not substantially outweigh its probative value. (*Chhoun*, *supra*, 11 Cal.5th at p. 29 [noting "prejudicial" is not synonymous with "damaging" and all evidence tending to prove guilt is prejudicial or damaging to the defendant's case]; *People v. Cage* (2015) 62 Cal.4th 256, 275 ["The 'prejudice' which [Evidence Code] section 352 seeks to avoid is that which ' " 'uniquely tends to evoke an emotional bias against the defendant as an individual *and which has very little effect on the issues*.' " ' "].)

Garcia, relied upon by defendant, does not compel a different result.  In *Garcia*, the defendants were members of a criminal street gang and faced several charges following a robbery of two victims which resulted in one victim's death.  (*Garcia*, *supra*, 107 Cal.App.5th at pp. 1044–1045.)  One of the defendants was recorded in an undercover operation admitting to being a member of the criminal street gang, and stating that the incident was not gang related and did not involve the gang's enemies and " 'was supposed to be just a robbery.' " (*Id*. at p. 1047.)  The trial court admitted gang-related evidence of the gang's violent nature and its engagement in illegal activities under Evidence Code section 352, noting the court found the evidence was relevant to prove the defendants' intent, motive, conspiracy and aiding and abetting.  (*Garcia*, at p. 1048.)

The Court of Appeal held the admission of the gang evidence resulted in a manifest miscarriage of justice.  (*Garcia*, *supra*, 107 Cal.App.5th at p. 1051.)  Important to its conclusion was that "no admissible evidence existed showing the crimes had any connection" to the defendants' gang.  (*Ibid*.)  Specifically, "there [was] no evidence in the record indicating gang signs were thrown, gang threats were made, or that the crime occurred on gang territory." (*Ibid*.)  The *Garcia* court determined that even assuming the gang-related evidence was relevant, its probative value was "minimal at best." (*Id*. at

p. 1054.) Moreover, considering the inflammatory nature and prejudicial impact of gang evidence, *Garcia* concluded the de minimis probative value of the evidence was substantially outweighed by a probability of undue prejudice. (*Id*. at p. 1058.)

The circumstances of the instant record are very different from *Garcia*. The gang evidence here was relevant to the prosecution's theory of motive. First, the victim in this case, Diaz, had an affiliation with a rival gang. According to the gang expert, in a small town like Reedley, it was very common for a member of a gang to have previously went to school with others who later joined a rival gang, and as a result, it was "not hard" to know of members in the opposing gang. The gang expert testified defendant's statement in his prison phone call, in which he discussed the time he "mobb[ed]" for "scraps" meant "to go out and proactively look" for Sureños. It cannot be said the probative value of the gang evidence at issue here was "minimal at best." (*Garcia*, *supra*, 107 Cal.App.5th at p. 1054.) Nor can it be said that the admission of the evidence was an abuse of discretion.

In any event, we further conclude any assumed error was harmless because, on this record, there is no reasonable probability defendant would have received a better result had the gang evidence not been admitted. (*People v. Watson* (1956) 46 Cal.2d 818, 836 [state law error is harmless unless it is reasonably probable that a result more favorable to the defendant would have been reached absent the error].) There was sufficient evidence of defendant's motive other than the gang evidence. Defendant was captured looking through the market's window around the time of the verbal interaction between Diaz and Godinez. Defendant was then seen "hyped up" and yelling in the market's parking lot prior to getting in the driver seat of his car and following the car Diaz was in. Defendant was captured driving past Diaz, turning around, and driving right at him. Moreover, Cardenas opined defendant was the shooter since the surveillance

12.

footage did not show a hand or arm extend out of the window when the shots were fired.[3] Additionally, the jury was instructed it could only consider the gang evidence for the purpose of motive. (See *People v. Silveria and Travis* (2020) 10 Cal.5th 195, 245 [we presume the jury understood and followed the court's instructions].)

## II. Lay Witness Opinion

Defendant contends the trial court abused its discretion by allowing Cardenas to opine that defendant was the shooter based on his review of the surveillance footage. The People contend the court properly exercised its discretion. We agree with the People.

### A. Additional Background

At defendant's trial, the surveillance video from the market was played for the jury. Cardenas testified that the surveillance video of the parking lot showed Godinez walking in the parking lot and getting into the passenger seat of defendant's car. Cardenas testified Godinez was wearing a grey shirt and khaki shorts. He further testified defendant was wearing a white shirt and black shorts.

After the prosecutor asked Cardenas if he had "an opinion as to who was the shooter between the person in the white shirt and the person in the … grey shirt" (boldface omitted), defense counsel objected on the grounds of foundation and "ultimate issue." The court overruled the objection, noting it would allow Cardenas "to testify only referring to the colors of the … shirts, not the identification of the individuals wearing the [shirt]." Cardenas testified he believed the person wearing the white shirt was the shooter. He testified this opinion was "[b]ased on the totality of the investigation, through my careful review of each video from the beginning to the end, also frame by frame, slow motion videos, and the entire investigation." When asked if there was anything "significant" (boldface omitted) about what was seen in the surveillance videos,

---

[3] For reasons we explain *post*, Cardenas's opinion testimony was not improperly admitted into evidence.

13.

Cardenas stated he observed that "there [was] not a hand or arm that crosses the threshold of [the] passenger window that is clearly opened," and "there [was] no object and/or firearm that passes the threshold of the window."

### B. *Applicable Law and Standard of Review*

" ' "A lay witness may express opinion based on his or her perception, but only where helpful to a clear understanding of the witness's testimony [citation], 'i.e., where the concrete observations on which the opinion is based cannot otherwise be conveyed.' " ' " (*People v. Sánchez* (2016) 63 Cal.4th 411, 456 (*Sánchez*); see Evid. Code, § 800.) " 'Such a situation may arise when a witness's impression of what he or she observes regarding the appearance and demeanor of another rests on "subtle or complex interactions" between them [citation] or when it is impossible to otherwise adequately convey to the jury the witness's concrete observations.' " (*Sánchez*, at p. 456.) The identity of a person is a proper subject of nonexpert opinion. (*People v. Leon* (2015) 61 Cal.4th 569, 601 (*Leon*).)

We review this claim for abuse of discretion. (*Sánchez*, *supra*, 63 Cal.4th at p. 456; *Leon*, *supra*, 61 Cal.4th at p. 600.) "[A] trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it." (*People v. Carmony* (2004) 33 Cal.4th 367, 377 (*Carmony*).)

### C. *Analysis*

Defendant argues the admission of Cardenas's opinion testimony on the identity of the shooter directly contravened well-settled principles of law protecting defendant's constitutional right to have the jury decide the ultimate issues in the case.

The admission of this type of testimony is not categorically impermissible. (See *Sánchez*, *supra*, 63 Cal.4th at pp. 456–457; *Leon*, *supra*, 61 Cal.4th at p. 601 ["Court of Appeal decisions have long upheld admission of testimony identifying defendants in surveillance footage or photographs."].) Opinion testimony is not impermissible simply because it goes to the ultimate issue of a case. (See *People v. Prince* (2007) 40 Cal.4th

14.

1179, 1227 ["Despite the circumstance that it is the jury's duty to determine whether the prosecution has carried its burden of proof beyond a reasonable doubt, opinion testimony may encompass 'ultimate issues' within a case."]; *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 77 ["opinion testimony often goes to the ultimate issue"]; see also Evid. Code, § 805 ["Testimony in the form of an opinion that is otherwise admissible is not objectionable because it embraces the ultimate issue to be decided by the trier of fact."].) Cardenas's opinion, which was based on his "frame by frame" review of each surveillance video in its entirety, was rationally based on his own perception. Specifically, Cardenas stated he thought the person wearing the white shirt, defendant, was the shooter because he did not see a limb extend out of the passenger side window of defendant's car. This testimony was based on his personal review of the evidence, and moreover, was helpful to the jury. (See *Leon*, *supra*, 61 Cal.4th at p. 601.) The court's ruling to admit Cardenas's testimony was not an abuse of discretion. (See *Carmony*, *supra*, 33 Cal.4th at p. 377.)[4] Having concluded the trial court did not err, we need not consider his further claim of prejudice.

### III. Motion To Strike Firearm Enhancement

Defendant contends the trial court erred under section 1385 by declining to strike his firearm enhancement. The People disagree.

#### A. Additional Background

The prosecutor filed a sentencing memorandum on July 22, 2024. In pertinent part, the sentencing memorandum opposed the dismissal of defendant's firearm enhancement, arguing doing so would endanger public safety. The memorandum detailed defendant's prior criminal history, including three prior felony convictions and

---

[4] This conclusion is not altered by the court's comments stating Cardenas was not allowed to identify the shooter by name. We review the court's ruling rather than its reasoning. (*People v. Brooks* (2017) 3 Cal.5th 1, 39.)

one prior strike conviction, and argued his current offense for murder showed an increase in the danger defendant posed and showed "a significant risk of continued violent conduct" by defendant. The memorandum further argued there was a likelihood that the enhancement's dismissal "would result in physical injury or danger to others in the future."

Defendant's sentencing memorandum was filed on July 23, 2024. As relevant here, the memorandum requested the trial court to dismiss his firearm enhancement.[5] The memorandum detailed defendant's background, including his childhood and upbringing, and noted that his prior strike conviction occurred over six years prior to the current offense. In requesting the enhancement's dismissal under section 1385, the memorandum referenced three of the mitigating circumstances listed in subdivision (c)(2) of that section: "The application of an enhancement could result in a sentence of over 20 years. In this instance, the enhancement shall be dismissed" (§ 1385, subd. (c)(2)(C)); "The current offense is connected to prior victimization or childhood trauma" (§ 1385, subd. (c)(2)(E)); and "The enhancement is based on a prior conviction that is over five years old" (§ 1385, subd. (c)(2)(H)).

The probation department filed its report, in which it detailed defendant's background and criminal history and summarized the facts of the instant offense. The report listed several aggravating circumstances, including: defendant engaged in violent conduct which indicated a serious danger to society; defendant's prior convictions as an adult or sustained petitions in juvenile delinquency proceedings are numerous or of increasing seriousness; defendant served a prior prison term; and defendant's prior performance on probation or parole was unsatisfactory. The report further listed the following mitigating circumstances: application of an enhancement could result in a

_____

[5] In the same portion of his sentencing memorandum, defendant also requested the court dismiss his strike prior. Defendant does not challenge on appeal the court's decision not to dismiss his strike prior.

16.

sentence over 20 years; and multiple enhancements are alleged in a single case. As relevant here, the report recommended the indeterminate term of 25 years to life for his firearm enhancement (§ 12022.53, subds. (d), (e)(1)) followed by the term of life without the possibility of parole on count 1.

The trial court held a sentencing hearing on July 25, 2024. The court stated it had read and considered the parties' sentencing memorandums and the probation report. Regarding the firearm enhancement, the court recognized it was required to consider exercising its discretion to strike the enhancement under section 1385. The court also considered if defendant "would continue to be a danger" to society at the time of his release if the enhancement was dismissed. The court determined defendant would continue to be a danger, stating:

> "Even though the [L]egislature to a degree requires judges to use a crystal ball and predict 50 years from what [defendant]'s behavior may be, his behavior today tells me that his behavior then would create a danger to the community if released given the facts and circumstances of this case and his prior criminal history."

The court found dismissal of defendant's firearm enhancement would endanger public safety, and declined to strike the enhancement.

### B. Applicable Law and Standard of Review

Effective January 1, 2022, Senate Bill No. 81 (2021–2022 Reg. Sess.) amended section 1385 to specify factors the trial court must consider when deciding whether to strike enhancements from a defendant's sentence in the interest of justice. (§ 1385, subd. (c); *People v. Mendoza* (2023) 88 Cal.App.5th 287, 295 (*Mendoza*).) "Notwithstanding any other law, the court shall dismiss an enhancement if it is in the furtherance of justice to do so, except if dismissal of that enhancement is prohibited by any initiative statute." (§ 1385, subd. (c)(1).) "In exercising its discretion under this subdivision, the court shall consider and afford great weight to evidence offered by the defendant to prove that any of the mitigating circumstances in subparagraphs (A) to (I) are present." (§ 1385,

17.

subd. (c)(2).) "Proof of the presence of one or more of these circumstances weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety. 'Endanger public safety' means there is a likelihood that the dismissal of the enhancement would result in physical injury or other serious danger to others." (§ 1385, subd. (c)(2).)

The three mitigating circumstances relied upon by defendant included that "[t]he application of an enhancement could result in a sentence of over 20 years. In this instance, the enhancement shall be dismissed" (§ 1385, subd. (c)(2)(C)); "[t]he current offense is connected to prior victimization or childhood trauma" (§ 1385, subd. (c)(2)(E)); and "[t]he enhancement is based on a prior conviction that is over five years old" (§ 1385, subd. (c)(2)(H)).

"[T]he plain language of section 1385, subdivision (c)(2) does not erect a rebuttable presumption in favor of dismissal that can only be overcome by a finding that dismissal endangers public safety." (*People v. Walker* (2024) 16 Cal.5th 1024, 1033.) "We emphasize, however, that, in most cases, 'if the trial court finds that dismissal of an enhancement would endanger public safety, then it is hard to see how dismissal would further the interests of justice,' notwithstanding the applicability of any mitigating factors identified in subdivision (c)(2)." (*Ibid.*) "[I]f the court finds that dismissal of an enhancement 'would endanger public safety,' then the court need not consider the listed mitigating circumstances." (*Mendoza*, *supra*, 88 Cal.App.5th at p. 296, fn. omitted.)

A trial court's decision whether to dismiss an enhancement pursuant to section 1385, subdivision (c) is reviewed for an abuse of discretion. (*People v. Gonzalez* (2024) 103 Cal.App.5th 215, 225 (*Gonzalez*); *Mendoza*, *supra*, 88 Cal.App.5th at p. 298.) "The abuse of discretion standard is highly deferential." (*Mendoza*, at p. 298.) "When, ' "as here, a discretionary power is statutorily vested in the trial court, its exercise of that discretion 'must not be disturbed on appeal *except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a

manifest miscarriage of justice.' " ' " (*Ibid*.; see *Carmony*, *supra*, 33 Cal.4th at p. 377 ["a trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it"].)  An abuse of discretion also occurs "if the trial court based its decision on impermissible factors [citation] or on an incorrect legal standard." (*People v. Knoller* (2007) 41 Cal.4th 139, 156.)

### C. Analysis

Defendant argues the trial court abused its discretion under section 1385, subdivision (c) by declining to dismiss his firearm enhancement.  Defendant asserts the court "did not address any of the [section] 1385 factors cited by the defense, nor did the court conduct on the record a balancing of the mitigating factors set forth by the defense against any aggravating factors that may have been present." (Fn. omitted.)  Defendant further asserts the court did not indicate whether it conducted a "balancing test" of aggravating and mitigating factors.

The court was not required to address the section 1385, subdivision (c)(2) mitigating factors because the court explicitly found that striking his enhancement would endanger public safety.  (*People v. Walker*, *supra*, 16 Cal.5th at p. 1033; *Mendoza*, *supra*, 88 Cal.App.5th at p. 296.)  As the *Mendoza* court aptly noted, "it is difficult to imagine the circumstances under which dismissal [of an enhancement] would be 'in the furtherance of justice,' " if the court already determined doing so would endanger public safety.  (*Mendoza*, at p. 296, fn. 4; see § 1385, subd. (c)(2).)  The court did not have an obligation to consider, let alone balance, any of the mitigating circumstances listed in section 1385, subdivision (c)(2).

Defendant also takes issue with the court's determination that defendant would pose a danger to public safety if his firearm enhancement was stricken.  He highlights the court's comment suggesting that it had to "use a crystal ball and predict 50 years from [today] what [defendant's] behavior may be."  Relying in part on *Gonzalez*, *supra*, 103 Cal.App.5th 215, he appears to argue the court failed to consider the parole board

and Governor's involvement in the assessment of whether he posed a risk to society at a future time, namely, when he would become eligible for parole. According to defendant, this consideration "should weigh greatly in the determination of what an appropriate sentence would be," and "[i]t would have allayed the court's concern that it was being asked to use a crystal ball to see 50 years into the future."

In *Gonzalez*, the trial court considered dismissing the defendant's firearm enhancement, which subjected defendant to an indeterminate term of 25 years to life in addition to his indeterminate term of 50 years to life for murder. (*Gonzalez*, *supra*, 103 Cal.App.5th at p. 220.) The trial court determined the defendant represented a danger to society " 'at the time of [his] sentencing' " and declined to dismiss his enhancement " 'for that reason.' " (*Id*. at pp. 223–224.) The Court of Appeal determined the trial court applied an incorrect legal standard by only considering whether the defendant posed a danger to public safety at the time of his sentencing since " '[d]etermining whether resentencing a defendant poses an unreasonable risk of danger to society is necessarily a forward-looking inquiry.' " (*Id*. at p. 229; see *id*. at p. 230.) The appellate court additionally noted the inquiry "for a defendant serving a lengthy indeterminate sentence should also take into account that the defendant's release from prison is contingent on review by the Board of Parole Hearings (and for murder convictions, by the Governor), who will have the opportunity to assess the defendant's dangerousness at that time." (*Id*. at p. 228.) According to the *Gonzalez* court, this "future review will act as a safety valve against a release that would endanger the public …." (*Ibid*.) As such, the appellate court opined the trial court "also should have considered the date on which [the defendant] could be released if the firearm enhancement was dismissed and the fact that the release would be subject to a review by the Board of Parole Hearings and the Governor." (*Id*. at pp. 230–231.)

We are not persuaded that the court's comment evidenced an abuse of discretion. First, unlike in *Gonzalez*, the court here correctly recognized it was required to consider whether defendant would be a danger to public safety "at the time of [his] release." (See *Gonzalez*, *supra*, 103 Cal.App.5th at pp. 228, 230–231 [noting trial court was required to assess whether public safety would be endangered in the future if the defendant was released from prison sooner due to an enhancement being dismissed].) Moreover, the record's absence of reference to the roles played by the Governor and parole board does not demonstrate that the court applied an incorrect legal standard. (See *id.* at p. 227 ["section 1385, subdivision (c)(2) 'does not require the trial court to consider any *particular* factors in determining whether "there is a likelihood that the dismissal of the enhancement would result in physical injury or other serious danger to others" ' "].) The record is silent as to whether the court understood the Governor or parole board may play a role in defendant's future release. (See *People v. Knowles* (2024) 105 Cal.App.5th 757, 765 ["We may not presume error from a silent record."].) We must assume the court understood and applied the correct law. (*People v. Parra Martinez* (2022) 78 Cal.App.5th 317, 322 ["Unless the record affirmatively demonstrates otherwise, the trial court is deemed to have considered all the relevant sentencing factors set forth in the rules."]; *People v. Brown* (2007) 147 Cal.App.4th 1213, 1229 ["[R]emand is unnecessary if the record is silent concerning whether the trial court misunderstood its sentencing discretion."].) On this record, we do not conclude that the court applied an incorrect legal standard.

## IV. Restitution Fine and Ancillary Costs

At the sentencing hearing, the court did not mention, much less impose, fees under either section 1465.8 or Government Code section 70373. As for restitution fines, defense counsel requested the court "consider staying any fines." The court stated:

21.

"… I'm going to do that. I'm going to order that the defendant receive time credits statutorily allowed of 1154 days, that is 1154 days actual, pursuant to [section] 2933.2. I'm also ordering that I'm staying the restitution fine under -- striking the restitution fine under [sections] 1202.4 and 1202.45.

"If a Court of review finds that is error to strike the restitution fine, I would find alternatively and impose the minimum restitution of $300 pursuant to [sections] 1202.4 and 1202.45."

The sentencing minutes, on the other hand, state, in pertinent part:

"Court orders Defendant to pay fee pursuant to [section ]1202.4. Amount: $10,000.00 [¶] Restitution Fund Fine purs [*sic*] to [section] 1202.45 suspended. Court orders fine imposed if Parole is revoked. [¶] Amount: $10,000.00 [¶] All [f]ees [s]uspended. Fee(s) amount suspended: $10,000.00 for the [section] 1202.4 and 1202.45 fees. [¶] Court Operations Fee purs. [*sic*] to [section] 1465.8 to the Court. Amount: $80.00 [¶] Criminal Conviction Fee purs. [*sic*] to [Government Code section ]70373 to the Court. Amount: $60.00."

The abstract of judgment included, in relevant part, the $80 court security fee pursuant to section 1465.8, and the $60 criminal conviction fee pursuant to Government Code section 70373. The abstract of judgment did not include a restitution fine under section 1202.4, subdivision (b) or a parole revocation fine under section 1202.45.

Defendant requests we order modifications to the court's sentencing minutes and to the abstract of judgment. First, he requests we order the minutes modified to reflect the court's pronouncement that it would impose at most the minimum restitution fine under section 1202.4. Second, he requests we order the abstract of judgment modified to strike the court operations fee (§ 1465.8) and criminal conviction fee (Gov. Code, § 70373).

The People request we modify the abstract of judgment to reflect the minimum restitution fine and a suspended parole revocation fine of $300.

While this appeal was pending, the California Supreme Court issued its decision in *Kopp*, *supra*, 19 Cal.5th 1. We ordered supplemental briefing on: (1) whether the trial court's failure to impose or strike the mandatory ancillary costs under section 1465.8 and

Government Code section 70373 resulted in an unauthorized sentence or otherwise constituted error; and (2) the appropriate remedy.

The People responded with supplemental briefing. They argue the abstract of judgment controls defendant's judgment, and we should affirm the judgment on this issue since the abstract of judgment already includes the two mandatory ancillary costs.

### A. The Kopp Decision

In *Kopp*, the California Supreme Court recently considered issues involving court-ordered financial obligations imposed on criminal defendants, including the restitution fine (§ 1202.4, subd. (b)) and "ancillary costs." (*Kopp*, *supra*, 19 Cal.5th at p. 9.) Ancillary costs, including the court operations assessment (§ 1465.8, subd. (a)) and court facilities assessment (Gov. Code, § 70373), are "funding mechanisms, created by the Legislature, to reimburse governmental agencies for expenditures or to otherwise fund a broad assortment of services. (*Kopp*, at p. 11.)

*Kopp*, *supra*, 19 Cal.5th 1 distinguished ancillary costs from the restitution fine, noting "[a] restitution *fine* under section 1202.4 constitutes punishment" (*id*. at p. 13), while "ancillary costs are generally not intended to punish the commission of a crime" (*id*. at p. 11). A restitution fine is "required in 'every case where a person is convicted of a crime' unless the court 'finds compelling and extraordinary reasons for not doing so and states those reasons on the record.' " (*Id*. at p. 13.) "For felony convictions, the required fine is not less than $300 and not more than $10,000." (*Ibid*.) The court also noted the restitution fine (§ 1202.4, subd. (b)) and ancillary costs are separate from a victim restitution order (§ 1202.4, subd. (f)). (*Kopp*, at p. 16.)

Regarding ancillary costs, *Kopp* noted that "[b]oth the court operations and facilities assessments must be imposed for every criminal conviction except parking offenses." (*Kopp*, *supra*, 19 Cal.5th at pp. 25–26.) The *Kopp* court observed that a "robust fee waiver system" was made available by the Legislature to qualified applicants in civil cases. (*Id*. at p. 26.) The court determined "there appears no rational basis to

deny only indigent criminal defendants the ability to avoid" the same costs imposed in both types of proceedings. (*Id*. at p. 29.) Thus, the court held: "equal protection principles require a court, upon request, to consider a defendant's inability to pay before imposing a court operations assessment under … section 1465.8, subdivision (a)(1) or a court facilities assessment under Government Code section 70373, subdivision (a)(1)." (*Id*. at p. 30.) *Kopp* remanded, in part, for further proceedings as to the imposition of the ancillary costs. (*Id*. at p. 31.)

### B. *The Oral Pronouncement of Sentence Controls*

In their supplemental brief, the People assert that "[s]ince the abstract of judgment already reflects the fine, there is no need to order the trial court to issue an amended abstract of judgment." This assertion relies on the premise that the abstract of judgment should control or announce the actual judgment under the circumstances. It does not. (*People v. Mitchell* (2001) 26 Cal.4th 181, 185.) The judgment is controlled by the court's oral pronouncements. (See *ibid*. ["An abstract of judgment is not the judgment of conviction; it does not control if different from the trial court's oral judgment and may not add to or modify the judgment it purports to digest or summarize."]; *People v. Zackery* (2007) 147 Cal.App.4th 380, 387–388 ["The clerk cannot supplement the judgment the court actually pronounced by adding a provision to the minute order and the abstract of judgment."].)

### C. *Ancillary Costs*

Section 1465.8, subdivision (a)(1), provides, in part: "To assist in funding court operations, an assessment of forty dollars ($40) shall be imposed on every conviction for a criminal offense."

Government Code section 70373, subdivision (a)(1), provides, in part: "To ensure and maintain adequate funding for court facilities, an assessment shall be imposed on every conviction for a criminal offense…. The assessment shall be imposed in the amount of thirty dollars ($30) for each misdemeanor or felony."

24.

The trial court was required to impose these ancillary costs unless it granted defendant fee waivers.  (*Kopp*, *supra*, 19 Cal.5th at pp. 25–26, 29–30.)  The court took neither action at the sentencing hearing.  This was error.

The sentencing minutes and the abstract of judgment, however, both reflect the imposition of the two fees at issue here.  We will not, as requested by defendant, strike the two fees from the abstract of judgment.  Pursuant to *Kopp*, these fees, absent waivers, are mandatory.  (*Kopp*, *supra*, 19 Cal.5th at pp. 25–26, 29–30.)  The record does not show that these fees were waived.  Nor will we, as requested by the People, modify the court's judgment to include these fees.  Although the omission of mandatory assessments "may be corrected for the first time on appeal" (*People v. Castellanos* (2009) 175 Cal.App.4th 1524, 1530), if we were to do that, the fees would be imposed without defendant having had the opportunity to request they be waived.  Instead, we will remand the matter for the trial court to correct the minutes from the July 25, 2024 sentencing hearing and to determine whether to impose the court operations fee (§ 1465.8, subd. (a)) and the criminal conviction fee (Gov. Code, § 70373) consistent with *Kopp*.

### D.  Restitution Fine

Defendant requests we order the trial court modify its sentencing minutes to conform to its oral pronouncements.  Specifically, he requests the minutes be "modified to indicate that the court orally indicated that at most it would impose [a] $300 [fine] under section 1202.4."

The People also request that we order a modification, but to the abstract of judgment.  The People request:  "[S]ince the trial court clearly evidenced an intent to impose the minimum fine to the extent imposing a fine was mandatory, respondent respectfully requests that the abstract of judgment reflect a $300 restitution fine under section 1202.4 and a suspended parole revocation fine of $300."

The restitution fine was discussed at the sentencing hearing. After defense counsel requested the court "stay[] any fees," the court stated it was "going to do that." The court then struck the restitution fine (§ 1202.4, subd. (b)) and added, "If a Court of review finds that is error to strike the restitution fine, I would find alternatively and impose the minimum restitution of $300 pursuant to [sections] 1202.4 and 1202.45."

The People request we modify the abstract to add the $300 minimum restitution fine, which the court stated was an alternative finding. Implicit in this request is the argument that the court's original action, striking the restitution fine, was erroneous. However, the People did not object to the restitution fine being stricken. When a party fails to object, at the time of sentencing, to a trial court's decision regarding the imposition of restitution fines, the "waiver doctrine" precludes appellate relief. (See *People v. Tillman* (2000) 22 Cal.4th 300, 302–303.)

The court struck the restitution fine at the sentencing hearing. Thus, to the extent the court's minutes reflect otherwise, the minutes should be modified to strike the restitution fines. (*People v. Frederickson* (2020) 8 Cal.5th 963, 1027.)

### DISPOSITION

The minutes from the July 25, 2024 sentencing are ordered to be corrected to reflect that the trial court did not impose ancillary costs pursuant to either section 1465.8 or Government Code section 70373, and that the court struck the section 1202.4, subdivision (b) restitution fine.

The matter is remanded to the trial court to determine whether to impose the court operations fee pursuant to section 1465.8 and the criminal conviction fee pursuant to Government Code section 70373. The abstract of judgment is ordered to be corrected to reflect the trial court's determination.

In all other respects, the judgment is affirmed.


DETJEN, Acting P. J.

WE CONCUR:


FRANSON, J.


DE SANTOS, J.